IN RE: INQUIRY CONCERNING A JUDGE, NO. 121 GEORGE R. GREENE, RESPONDENT

No. 289A89

(Filed 2 May 1991)

1. **Judges § 7 (NCI3d)— judicial disciplinary proceeding—due process—access to investigative files**

   Due process did not require that the respondent in a judicial disciplinary proceeding have open access to the Judicial Standards Commission's investigative files.

   **Am Jur 2d, Judges §§ 18-20, 50.**

2. **Judges § 7 (NCI3d)— judicial disciplinary proceeding— consideration of evidence in files—failure of record to support contention**

   Defendant's contention that the Judicial Standards Commission considered evidence in its files not revealed to respondent and was thus not a fair and impartial tribunal was not supported by the record since (1) the record shows only

that the Commission's recommendation was based solely on its findings contained in its order and its conclusions drawn from those findings, and (2) the Supreme Court rather than the Commission decides whether respondent's conduct is deserving of censure, and the only conduct of which the Supreme Court has knowledge is that revealed by the evidence before the Commission which formed the basis of its recommendation.

**Am Jur 2d, Judges §§ 18-20, 50.**

3. **Judges § 7 (NCI3d) — censure of judge — conduct prejudicial to administration of justice**

A superior court judge is censured by the Supreme Court for conduct prejudicial to the administration of justice that brings the judicial office into disrepute for the following conduct which occurred while he was a district court judge: (1) while presiding over a prosecution for assault on a female, respondent told the victim that she would ruin her children's lives if she did not reconcile with defendant, referred to a battered women's assistance group whose representative was present in court in support of the victim as a one-sided, man-hating bunch of females and pack of she-dogs, and polled the courtroom spectators as to how many of them had little spats during their marriages; and (2) while presiding over the trial of a defendant charged with speeding on Rock Quarry Road in Wake County, respondent stated that he also speeds on the same road by driving fifty-two miles per hour in a forty-five miles per hour zone, and while presiding over other speeding trials respondent routinely admitted that he drove fifty-two miles per hour in forty-five miles per hour zones and sixty-five miles per hour in fifty-five miles per hour zones and counseled defendants charged with speeding that they should restrict their speeding violations to those limits in order to avoid apprehension and conviction.

**Am Jur 2d, Judges §§ 18-20, 50.**

THIS matter is before the Court upon a recommendation of the Judicial Standards Commission that respondent, George R. Greene, a judge of the General Court of Justice, Superior Court Division,[1] be censured for conduct prejudicial to the administra-

---

1. At all times material to the proceedings in this matter, Judge Greene was a judge in the District Court Division, Tenth Judicial District. Judge Greene was

IN RE GREENE

[328 N.C. 639 (1991)]

tion of justice that brings the judicial office into disrepute in violation of N.C.G.S. § 7A-376 and which violates Canons 2A, 3A(2) and 3A(3) of the North Carolina Code of Judicial Conduct. Heard in the Supreme Court 15 November 1989.

*Bailey & Dixon, by Wright T. Dixon, Jr., and Alan J. Miles, for respondent-appellant.*

*Lacy H. Thornburg, Attorney General, by James J. Coman, Senior Deputy Attorney General, Special Counsel to the Judicial Standards Commission.*

PER CURIAM.

Respondent urges this Court to reject the Judicial Standards Commission's (Commission) recommendation. He argues (1) the proceedings against him should be dismissed because they denied him procedural due process; (2) the Commission's factual findings are not supported by clear and convincing evidence, and (3) the findings do not support the Commission's conclusions.

The proceedings against respondent occurred as follows:

After advising respondent by confidential notice dated 4 January 1988 that it had ordered a preliminary investigation to determine whether formal proceedings should be instituted against him, the Commission, on 7 October 1988, concluded that formal proceedings should be instituted and served Notice of Complaint and a verified complaint upon respondent on 16 October 1988.

The complaint alleged that respondent, while presiding over a criminal session of Wake County District Court on 16 October 1987, heard a case which involved a charge of assault on a female. The complaint alleged:

> The respondent criticized the victim's decision not to reconcile with the defendant and implied that the assault was justified and deserved. The respondent also made derogatory remarks about Interact, the battered women's assistance group whose representative was present in court in support of the victim, including the comment that they were "a one-sided man-hating bunch of females." Following the trial, the respondent ap- ·

—————————

elected judge in the Superior Court Division in the 1988 General Election and began serving in that capacity on 1 January 1989.

IN RE GREENE

[328 N.C. 639 (1991)]

proached where the victim and the Interact representative were standing in the hall. The respondent grinned at . . . the victim in the case, and asked if she forgave him. He then told [the victim] in the presence of the Interact representative that once his wife had slapped him and that he had "laid her on the floor and did not have any more problems from her."

Respondent answered these allegations by denying his conduct was prejudicial to the administration of justice because:

A. The attempted counseling to the prosecuting witness was given after hearing the evidence and finding the defendant "guilty." That his opinion remains that in light of the evidence, the two children of the parties and the obvious pregnancy of the prosecuting witness, a joint working out of their difficulties was the best course for *all* of the involved parties.

B. The remarks about "Interact" persons were made outside Court and as a result of and in response to their previous disruption in the Courtroom and the proceedings before Respondent by representatives of that group. Further, to the attempts by those same representatives to influence Respondent's decision and invade his impartiality by improper pressure tactics. Finally, to the interference, after Court, in his attempt to mitigate any personally perceived prejudice by the prosecuting witness.

C. Respondent made a good faith and sincere attempt to ameliorate any hostility with the prosecuting witness Myra Sheffield by asking her if she forgave him for any misunderstanding which may have occurred in the Courtroom.

The complaint also alleged:

(c) While presiding over a criminal session of Wake County District Court on 24 February 1988, the respondent engaged in a conversation with a defendant who was charged with speeding on Rock Quarry Road in Wake County. The respondent admitted during the conversation in open court that a defendant who was charged with speeding on Rock Quarry Road that the respondent drives the same route at 52 miles per hour, which is in excess of the posted speed limit of 45 miles per hour.

Respondent answered this allegation by admitting having made the statement attributed to him but denying it was conduct prejudicial to the administration of justice because:

A. Respondent was merely attempting to make the point to the particular Defendant that reality is that police policy allows drivers some leeway with regard to speed limits on certain roads. Respondent routinely tells this to defendants who appear in his Courtroom charged with speeding. Respondent knows that the police also give defendants who are speeding a few miles over the limit a warning. Respondent attempts to impress upon Defendants that speeding in excess of the leeway allowed by the police becomes a serious offense.

B. Respondent did not mean to imply by his statement that he approved of driving in substantial excess of the posted speed limit.

By letter dated 23 November 1988 respondent's counsel requested Special Counsel for the Commission, Mr. James Coman, to furnish the following items:

1. A list of witnesses you expect to call to testify before the Commission against Judge Greene and a summary of what you expect their testimony to be;

2. Copies of any written statements or complaints made to the Commission or its investigators as a part of this inquiry;

3. Copies of any transcription of oral statements made to the Commission or its investigators as part of this inquiry;

4. Any letters, statements, or complaints filed by any individual with the Commission concerning Judge Greene which might have lead [sic] to the initiation of this inquiry; and

5. Copies of any investigative reports submitted by any person utilized by the Commission to conduct this inquiry.

Mr. Coman replied on 3 January 1989. Mr. Coman's letter advised respondent's counsel of the names of witnesses expected to be called against respondent and gave a detailed summary of the testimony each witness was expected to give. The letter advised that "investigative reports . . . are considered confidential and are not made available unless such information is presented

at the hearing." The letter noted that exculpatory material known by Special Counsel had been made available by advising respondent's counsel regarding certain people "they may want to speak with or people who do not support the contentions of the witnesses to be presented . . . in furtherance of the complaint."

By letter dated 10 January 1989 to Judge Gerald Arnold, Commission Chairman, respondent's counsel expressed dissatisfaction with the discovery procedures of the Commission and requested that the Chairman "order the Special Counsel to adopt an 'open file' policy on discovery." Respondent complained that Commission's Special Counsel, Mr. Coman, had asserted the "confidentiality" of the proceedings as grounds for denying access to all of the Commission's investigative files.

After a meeting of respondent's counsel, Commission Special Counsel, and Judge Arnold in Judge Arnold's office on 15 February 1989, Judge Arnold advised respondent's counsel by letter dated 17 February 1989 that he had personally reviewed the report and the letter response of Special Counsel. He concluded the response was reasonable. He denied respondent's counsel's request that he order Special Counsel to disclose all material in the investigative file.

On 16 March 1989 respondent's counsel moved to dismiss the complaint "for failure of the Special Counsel to comply with reasonable requests for discovery."[2]

Formal hearing after notice before the Commission was conducted on 2 June 1989. Evidence for the Commission tended to show as follows:

On 16 October 1987 respondent presided over a trial involving a charge of assault on a female against the husband of the prosecuting witness. A representative of Interact, a counseling service for persons in violent marriages or domestic situations, was present in court with the victim. Respondent made certain remarks concerning Interact. One witness recalled these remarks as accusing Interact of being "anti-man or man-hater or something like that . . . ." Another witness, the representative from Interact, testified that respondent "lectured the victim." This witness made contemporaneous handwritten notes of respondent's remarks made, she

_____

2. No action on this motion by the Commission appears of record. By implication at least the motion was denied.

IN RE GREENE

[328 N.C. 639 (1991)]

said, in the courtroom. She later used these contemporaneous notes to draft a letter of complaint to the Judicial Standards Commission after which she destroyed the handwritten notes.

Using her letter to the Commission to refresh her recollection, this witness testified that respondent told the prosecuting witness that she shouldn't have anything to do with Interact and "Interact was a one-sided, man-hating bunch of females, a pack of she-dogs." The witness said respondent told the prosecuting witness that "she was being selfish not to go back [to her husband] and that she would ruin her children's lives." Respondent said, "You really haven't been hit that much. You deserve to be hit. How is a man supposed to react?"

There was other testimony that respondent polled the persons in the courtroom to see how many had "had little spats in their marriages."

After the proceeding in court was completed, the Interact witness and the prosecuting witness came into contact with respondent outside the courtroom. According to these witnesses respondent told them that his wife had once slapped him and "he had laid her on the floor and had never had any problems from her since." Respondent then asked the assault victim to forgive him, and she replied negatively.

On 24 February 1988, while hearing an alleged speeding violation, which had occurred on Rock Quarry Road, respondent remarked, "Now, you know everybody speeds . . . . Everybody drives fifty-five miles an hour on Rock Quarry Road. And do you know how I know that everybody drives fifty-five miles an hour on Rock Quarry Road? Because I drive fifty-five miles an hour on Rock Quarry Road."

Respondent testified in his own behalf and offered corroborative witnesses. His testimony tended to show as follows:

In the assault case respondent was concerned because he thought there were persons in the courtroom supporting the prosecuting witness who were trying to influence his decision and judgment in the matter. Respondent "got mad." He admitted making the remark about having slapped his wife down, but said that this was an exaggerated version of what actually happened. Respondent said, "And if I lost it, I lost it. But I did the best that I could under the circumstances sitting as judge and jury." Respondent

recalled that he was not directing his "she-dogs" remark to Interact or any other particular group. He had no knowledge of Interact at the time and did not know there were Interact representatives in the courtroom. He said, "My recollection is that I said if men got into an argument they would argue, might even sometimes fight, but sooner or later they would forget about it, go on and be friends. Women are just the opposite. They get in an argument, they act like a bunch of she-dogs, something of that effect. I never referred to any particular group as being she-dogs. I said women in general. It was a general comment. It might not have been in good taste, but that's what I recall saying."

Regarding his comments concerning speed limit violations, respondent testified his experience had been that officers in traffic cases ordinarily do not issue citations unless the motorist is speeding ten miles or more over the posted speed limit and "that's common knowledge all over Wake County." Respondent said, "In my effort to educate the public on how not to get speeding tickets, I have consistently said I've locked my cruise control on fifty-two miles an hour in a forty-five zone. I speed — I drive thirty-five in a thirty-five and twenty-five in a twenty-five. On the open highway where the speed limit is fifty-five I never exceed sixty-two. I have done it repeatedly, repeatedly, repeatedly; and I won't deny it. But I have never said that I sped fifty-five on Rock Quarry Road. That is that lady's version, the way she wanted to give it to you. I did not say that, I categorically deny it."

After the hearing the Commission notified respondent that it had determined to file a recommendation with the Supreme Court of North Carolina. On 28 June 1989 the Commission served its formal recommendation on respondent.

The Commission recommends to the Court that respondent be censured. In support of this recommendation the Commission advised the Court that it found the following facts on clear and convincing evidence:

(a) The respondent demeaned the dignity and integrity of the proceedings before him and his judicial office when during proceedings in open court in an assault on a female case, *State v. Sheffield*, Wake County file number 87CR50908, over which he presided on 16 October 1987, he embarassed [sic] and humiliated the seven-months' pregnant victim of the assault by telling her she would ruin her children's lives if she did

not reconcile with her estranged husband, she deserved to be hit, and she had not been hit that much; he referred in a derogatory manner to the representative of the support group who was with the victim and the support group itself, which he later came to know was Interact, as a one-sided, man-hating bunch of females and a pack of she-dogs; and he polled the courtroom spectators as to how many of them had little spats during their marriages.

(b) While presiding over the 24 February 1988 criminal session of Wake County District Court, the respondent admitted in open court during a conversation with a defendant charged with speeding on Rock Quarry Road in Wake County that he also speeds on the same road by driving 52 miles per hour in a 45 miles per hour zone. Furthermore, the respondent routinely admitted in open court while presiding over other district court criminal sessions that he broke the law by driving 52 miles per hour in 45 miles per hour zones and 62 miles per hour in 55 miles per hour zones and routinely counselled defendants appearing before him charged with speeding and others present in the courtroom that they should restrict their speeding violations to these limits in order to avoid apprehension and conviction.

The Commission concluded respondent's actions constitute conduct prejudicial to the administration of justice that brings the judicial office into disrepute in violation of N.C.G.S. § 7A-376 and which violates Canons 2A, 3A(2), and 3A(3) of the North Carolina Code of Judicial Conduct.

Respondent continues to press his claim here that the proceedings before the Commission denied him due process of law. He makes two arguments: First, the Commission failed to provide respondent adequate prehearing discovery because it denied respondent open and full access to the Commission's investigative files. Second, the Commission itself was not a fair and impartial tribunal.

We conclude respondent was afforded due process in these proceedings. We make this conclusion in light of the nature of a judicial disciplinary proceeding begun before the Commission. Such proceeding "is neither criminal nor civil in nature. It is an inquiry into the conduct of a judicial officer, the purpose of which is not primarily to punish any individual but to maintain due and

proper administration of justice in our State's courts, public confidence in its judicial system, and the honor and integrity of judges." *In re Crutchfield*, 289 N.C. 597, 602, 223 S.E.2d 822, 825 (1975). "Albeit serious, censure and removal are not to be regarded as punishment but as the legal consequences attached to adjudged judicial misconduct or unfitness." *In re Nowell*, 293 N.C. 235, 241, 237 S.E.2d 246, 251 (1977).

We agree with respondent, nevertheless, that in judicial disciplinary proceedings begun before the Judicial Standards Commission a judge is entitled

> to a hearing which meets the basic requirements of due process. [Citation omitted.] "The Commission's procedures are required to meet constitutional due process standards since a judge's interest in continuing in public office is an individual interest of sufficient importance to warrant constitutional protection against deprivation." *In re Hanson*, 532 P.2d 303, 305 (Alas. 1975); *In re Haggerty*, 257 La. 1, 241 So.2d 469 (1970).

*Id.* at 241-42, 237 S.E.2d at 251. The Law of the Land Clause in the North Carolina Constitution "guarantees to the litigant in every kind of judicial proceeding the right to an adequate and fair hearing . . . . Where the claim or defense turns upon a factual adjudication, the constitutional right of the litigant to an adequate and fair hearing requires that he be apprised of all the evidence received by the court and given an opportunity to test, explain, or rebut it." *In re Custody of Gupton*, 238 N.C. 303, 304, 77 S.E.2d 716, 717-18 (1953) (judgment in custody action vacated when presiding judge determined facts in part on the basis of unrevealed evidence gathered "in secret from undisclosed sources" without party's knowledge or that of his counsel) (citations omitted).

[1] Here respondent was accorded an adequate and fair hearing, was apprised of all material evidence received and relied on by the Commission and given opportunity to test, explain and rebut it. Respondent has referred us to no authority, and we know of none, for the proposition that due process requires a respondent judge in a judicial disciplinary proceeding to have open access to the Commission's investigative files. Respondent concedes that neither the Administrative Procedure Act, N.C.G.S. § 150B-1, *et seq.*, nor the North Carolina Rules of Civil Procedure, N.C.G.S. § 1A-1, apply to proceedings before the Judicial Standards Commission. Indeed, due process does not mandate open access to the

**IN RE GREENE**

[328 N.C. 639 (1991)]

prosecution's files even in criminal cases. *State v. Tatum*, 291 N.C. 73, 229 S.E.2d 562 (1976); *cf. State v. Davis*, 282 N.C. 107, 191 S.E.2d 664 (1972).

[2] Respondent's contention that the Commission itself was not a fair and impartial tribunal is based on his assertion that the Commission was aware of, and either biased by or used against him, certain evidence in its files which was not revealed to respondent. In support of this contention respondent relies on the following colloquy between respondent and Special Counsel:

Q. When you talked with the investigators for the Commission, did you make any analogy or reference as to what you thought this was all about?

A. Uh-huh (yes), I did.

Q. And do you think that that analogy is a valid assessment of what this is all about, Judge Greene?

A. There is room for me to think so, but I would not categorically say yes.

Mr. Coman: No further questions.

Respondent argues that whatever analogy was referred to by Special Counsel must have been known to the Commission yet not revealed to respondent. We reject this argument. It is based on speculation and is not supported by the record. Responding to this argument, the Commission moved the Court to be permitted to amend the record on appeal so as to include its entire investigative report for *in camera* inspection by the Court. Respondent resists this motion and prays that it be denied. The Court has elected to deny the motion.

We cannot sustain this argument of respondent for two reasons: First, we do not know what the mysterious analogy was, whether the Commission knew of it, and if it knew of it, whether the analogy affected its decision. So far as the record reveals the Commission's recommendation was based solely on its findings contained in its order and its conclusions drawn from those findings. Second, it is not the Commission but this Court which decides whether respondent's conduct is deserving of censure. The only conduct with which we are concerned and of which we have knowledge is that revealed by the evidence before the Commission which formed the basis of its recommendation.

[3] Respondent next contends the findings of the Commission are not supported by clear and convincing evidence and that its findings do not support its conclusions or its recommendation.

While there is some evidence to support all the Commission's findings, we conclude the finding that respondent told the prosecuting witness in the assault case that she deserved to be hit and had not been hit that much is not supported by clear and convincing evidence. We reject this finding. We conclude the other findings of the Commission are supported by clear and convincing evidence, and we adopt them as our own. *See In re Nowell*, 293 N.C. 235, 237 S.E.2d 246. Respondent's answer to the complaint does not deny that he made the remarks the complaint attributed to him, and the thrust of his testimony before the Commission is not to deny many of the remarks attributed to him by the complaining witnesses and found by the Commission to have been made. His testimony seems to be directed primarily toward making his remarks seem less egregious in light of respondent's version of his motives and the context in which the remarks were made. That respondent's motives might have been pure does not necessarily detract from the egregious effect of his remarks on others. "Whether the conduct of a judge may be characterized as prejudicial to the administration of justice which brings the judicial office into disrepute depends not so much on the judge's motives but more on the conduct itself, the results thereof, and the impact such conduct might reasonably have upon knowledgeable observers." *In re Crutchfield*, 289 N.C. 597, 223 S.E.2d 822.

Canon 2A of the North Carolina Code of Judicial Conduct provides "[a] judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Canon 3A(3) provides in part: "A judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom he deals in his official capacity."

We agree with the conclusion of the Commission that respondent's conduct which we have concluded has been proved by clear and convincing evidence violated both of these canons and that it was conduct prejudicial to the administration of justice that brings the judicial office into disrepute in violation of N.C.G.S. § 7A-376.

ELECTRIC SUPPLY CO. v. SWAIN ELECTRICAL CO.

[328 N.C. 651 (1991)]

Now, therefore, it is ordered by the Supreme Court of North Carolina, in conference, that respondent, Judge George R. Greene, be, and he is hereby, censured by this Court for the conduct determined by the Court to be conduct prejudicial to the administration of justice that brings the judicial office into disrepute.

Justices MITCHELL and FRYE did not participate in the consideration or decision of this case.